UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

David Murphy,

Petitioner

v.

Calvin Johnson,[1] et al.,

Respondents

Case No. 2:21-cv-00092-CDS-DJA

**Order Denying Petition, Denying a
Certificate of Appealability,
and Closing Case**

[ECF No. 21]

Petitioner David Murphy filed a counseled first-amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 21. Murphy argues that the trial court erred in failing to sever his trial and allowing a late-disclosed witness to testify, and that his trial counsel was ineffective. For the reasons discussed below, I deny the first amended petition and decline to issue a certificate of appealability.

I.      **Background**

In October 2016, a jury convicted Murphy of conspiracy to commit robbery (count 1); burglary while in possession of a deadly weapon (count 2); home invasion while in possession of a deadly weapon (count 3); two counts of attempted robbery with a deadly weapon (counts 4 and 5); second-degree murder with a deadly weapon (count 6); and attempted murder with a deadly weapon (count 7). ECF No. 42-3. The state district court sentenced Murphy to an aggregate term of 23 years to life. ECF No. 42-7. Judgment of conviction was entered on December 2, 2016. ECF No. 42-8. The Nevada Court of Appeals affirmed his convictions and affirmed the denial of his state postconviction petition. ECF Nos. 43-6, 43-28.

---

[1] According to the state corrections department's inmate locator page, Murphy is incarcerated at Ely State Prison. The department's website reflects Débora Borgas is the warden for that facility. At the end of this order, I direct the Clerk to substitute Débora Borgas for prior respondent Calvin Johnson, under, inter alia, Rule 25(d) of the Federal Rules of Civil Procedure.

Murphy dispatched his federal habeas corpus petition for mailing about January 12, 2021. ECF No. 9 at 23. The Court granted his motion for counsel, and he filed an amended petition through his counsel the Federal Public Defender (FPD) on January 17, 2023. ECF No. 21. He now presents three grounds for adjudication on the merits:

> Ground 1: The trial court refused to sever Murphy's trial from his co-defendants' trial, violating Murphy's Fifth, Sixth, and Fourteenth Amendment rights.

> Ground 2: The trial court allowed a witness to testify after the prosecution disclosed her late in violation of Murphy's Fifth, Sixth, and Fourteenth Amendment rights.

> Ground 3: Trial counsel was ineffective for waiving cross-examination of a co-defendant, violating Murphy's Fifth, Sixth, and Fourteenth Amendment rights.

ECF No. 21 at 11–18.

Respondents have answered the petition, and Murphy replied. ECF Nos. 73, 83.

## II.      Standard of review

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v.*

*Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires . . . [t]he state court's application of clearly established law [to] be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

### III.    Trial testimony[2]

After aborting an attempt to break into a different house that morning, three men attempted to break into Joey Larsen's home to steal marijuana and money. Larsen's father had been warned of the robbery and urged Larsen to leave the house. Instead, Larsen and his roommate, Monty Gibson, armed themselves and waited inside. Robert Figueroa, Jorge Mendoza, and Joey Laguna approached the house on a Sunday evening in September 2014. All three were armed. Figueroa broke down the front door. As soon as he tried to enter the house he was shot in the face. He turned to run away and was shot again in the side. As Mendoza was trying to retreat; a gunshot shattered his femur. Mendoza fired back into the house, killing Gibson. Mendoza was scooting on

---

[2] I make no credibility or other factual findings regarding the truth or falsity of this evidence from the state court. This summary is merely a backdrop to my consideration of the issues presented in the petition.

his butt trying to get away. David Murphy was driving Mendoza's car and picked up Laguna. He pulled up to Mendoza and spoke to him but then drove away.

A neighbor testified that he heard loud bangs that he realized were gunfire about 8 p.m. ECF No. 35-3 at 67–94. He crouched and looked out his front window and saw a man in the street wearing an orange ski mask, holding a semi-automatic rifle and scooting on his butt. He watched the man for a few minutes then went upstairs to call 911. A car drove up to the man, he removed his ski mask and spoke to the occupants. He couldn't tell the make or model of the car or how many people were in it. After perhaps 15-20 seconds, the car sped off. The neighbor watched the man scoot halfway down the street and get behind a pickup truck. Responding police officers tracked a trail of blood to a pickup with the tailgate down. ECF No. 35-3 at 96–127. A rifle was in the back.

Summer Rice[3] testified that she was estranged from her husband Joey Larsen in the summer of 2012 and that she and Murphy were in a casual sexual relationship at that time. ECF No. 36-1 at 93–120.[4] She had known Larsen since she was 14 and had known Murphy since she was about 18. Rice said that Murphy's nickname is "Duboy" and that she called him Doughy. *Id.* at 94. Larsen sold about 20 pounds of marijuana per month out of his house. A couple of months before the home invasion, Rice told Murphy that she was mad at Larsen so she had gone to his house with another guy who helped her steal marijuana and money. Murphy told her she should have had him help her instead. About three weeks before the incident, she and Murphy discussed robbing Larsen's marijuana supplier. Rice had also talked about robbing Larsen with her friend Ashley Hall's boyfriend, who went by the moniker "Twisted." Hall overheard a conversation about stealing drugs and she told Rice that Rice better not be planning to steal anything at Larsen's house. Rice told Murphy that Larsen would pay for the drugs on Thursday and then she and Larsen would go to the supplier's house to pick them up the following Sunday. Rice showed Murphy where the supplier's house was. Rice had never seen Figueroa, Mendoza or Laguna and

---

[3] Rice is Summer Larsen's maiden name.
[4] *See also* testimony of Detective Barry Jensen, ECF No. 39-1 at 92–146; ECF No. 39-2 at 10–156.

4

had no idea who they were. Rice was charged along with the four men with seven counts including murder. She pleaded guilty to lesser charges a week before trial and agreed to testify. Murphy's counsel played a recorded call from jail in which Rice told her grandmother that she would do anything she had to do to get probation.

Robert Figueroa testified that soon after he was indicted, including for murder, he began to cooperate with police. ECF No. 38-1 at 208–252; ECF No. 38-3 at 6–85, 91–144; ECF No. 39-1 at 31–91. He pleaded guilty to robbery with a deadly weapon and conspiracy to commit robbery. The day of the murder, his former roommate Laguna called Figueroa in the early morning to tell him he had a robbery lined up. Laguna indicated that Larsen's supplier had a house with hundreds of pounds of marijuana and that Duboy would take part in the robbery too. Figueroa had been around Duboy two or three times before the day of the robbery. Figueroa said that Duboy's real name was David Murphy and identified Murphy in court. Laguna and Mendoza picked up Figueroa around 7:30 a.m. in Mendoza's car. Figueroa had never met Mendoza. Laguna and Mendoza told him that Duboy would be waiting in his truck around the corner from the house they were going to rob in order to transport the marijuana. Near the target house, Duboy pulled up in his white Ford Ranger. Duboy's girlfriend got out of the truck and got into the driver's seat of Mendoza's car; Mendoza got in the backseat. They drove by the house, but there were several people around including a landscaping crew. They turned around in a cul-de-sac and left the area.

Everyone went back to Laguna's house. Duboy told them that Larsen bought marijuana from the dealer that they had targeted that morning. Duboy said they could probably steal 30 to 50 pounds of marijuana. Figueroa said Duboy knew about the house because he was sleeping with the girlfriend or wife of the homeowner. Figueroa returned to his apartment; Mendoza picked him up again around 7 p.m. that evening and they went to Laguna's house. Duboy was there. The four of them got into Mendoza's car; Figueroa had two handguns with him and Laguna had a rifle. Duboy drove. They arrived at Larsen's house around 8 p.m. Figueroa, Mendoza, and Laguna went up to the front door. Figueroa rammed the door open with his shoulder and was immediately shot in the

face. He turned to run and was shot in the side. As he ran down the street he heard gunshots. He saw Duboy drive off so he kept running.

Figueroa hid in bushes in someone's yard for eight or nine hours while he tried calling for someone to pick him up. Laguna never answered his calls. His sister picked him up around 6 a.m. Two or three days later he traveled to a California hospital where doctors treated his jaw. He told police there that he had been target shooting when a bullet ricocheted. He was arrested after he returned to Las Vegas, and he initially told police that he had been going to Larsen's house to buy marijuana. He said when he walked up, he found that the front door had been kicked in and heard arguing; then he was shot.

At the time Figueroa was charged, Mendoza was the only other person who had been charged. Police led Figueroa to believe that Mendoza had told them that Figueroa was the mastermind. He learned from police that Summer Rice was the homeowner's wife and showed him her picture. Figueroa had never seen her but he told police that Duboy was sleeping with the homeowner's wife and that's how Duboy knew about the two houses they targeted. Figueroa had seen no discovery at the time he made a statement to police that the four men along with Duboy's girlfriend driving had planned to rob a different house that morning, then when they attempted to rob the second house he was shot and fled. Police showed him a picture of an individual they believed to be Duboy; it wasn't Murphy. They later showed him a picture of Murphy and he identified him as Duboy.

Mendoza took the stand in an attempt to show that he acted in self-defense when he shot Gibson. ECF No. 40-1 at 79–231. He testified to the following. He testified that he's related to Murphy by marriage and they consider themselves cousins. He was an acquaintance of Laguna's but had never met Figueroa until the day of the shooting. He did not know Rice. Mendoza and Murphy originally came up with the idea to rob the supplier. Murphy called him at 4 a.m. the morning of the incident and he went over to Murphy's house. They picked up Laguna and Figueroa. His testified similarly to Figueroa that they all met up, drove the car and truck to the

6

supplier's house, and left when there was too much activity in the area. Mendoza picked up Figueroa later that day. Figueroa pressured him to go back to his house and retrieve his rifle. They picked up Laguna, then Murphy arrived, and they all left in Mendoza's car with Murphy driving. Near Larsen's house, Figueroa told everyone that he'd open the door and "get everyone under control," Mendoza would go upstairs and grab the bag of marijuana, and Laguna would be watching for any surprises. Murphy dropped them off. Figueroa rammed the front door open and gunfire started. Figueroa ran out, bumped into Mendoza, and Mendoza fired a couple of rounds. Two men emerged from the house shooting at him. He fired back toward the house. He testified that he feared for his life and wasn't aiming at anyone or trying to hit anyone. Mendoza was shot; he couldn't walk so he scooted away from the house on his butt. He discarded his rifle and gloves and a shirt he'd been wearing in the back of a truck parked on the street. He then managed to crawl into an unlocked car where police apprehended him. Initially, he told police that he'd been the victim of a carjacking.

Murphy called Ashley Hall to testify. ECF No. 40-2 at 46–67. She said she had grown up with Larsen and Rice; she knew who Murphy was but had never spoken to him. In the weeks preceding the attempted robbery she had been giving Rice rides because Rice was without a car. She picked up Rice one day; Rice was in a panic because she owed someone money. As they drove, Rice was calling people trying to borrow money. Hall heard Rice comment that she would tell someone that she'd pay them on Sunday because she was going to rob Larsen around 8:30 p.m. that day. Hall knew Rice had broken into the house before. When Rice got off the phone, Hall told her absolutely to not rob Larsen because he didn't deserve it. Hall was also driving when Rice and two men (who were not the defendants or Figueroa) were in the car discussing the robbery. The next day Hall tried to warn Larsen; she sent him a text and left a voice mail. Hall got in touch with Larsen's father through a friend. Hall also texted Rice to tell her she was going to warn Larsen and urged her not to do anything stupid.

Las Vegas Metropolitan Police Department ("LVMPD") officer Christopher Gandy testified that he was on the technical detail and that he had reviewed phone records from the day of the incident for Figueroa, Mendoza, Laguna, and Murphy. *See* ECF No. 38-1 at 64–116. The records showed that the four called and texted each other numerous times that day. The records also showed general locations for the four that corresponded with Figueroa and Mendoza's accounts of the events of the day. Murphy's phone hit off the cell phone tower that serviced the area of the first target house around 5 a.m. and again around 9 a.m. *See id.* at 115–116. Murphy's phone also hit off towers near the Laguna residence and the Mendoza residence at the times that the testimony put Murphy at those homes.[5] Records showed that Amanda Mendoza's phone hit a tower near her home around midnight and then a tower near the Laguna residence around 1 a.m.

## IV.   Discussion

### A.   Ground 1—failure to sever trials

Murphy argued that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights when it refused to sever Murphy's trial from co-defendant Mendoza. ECF No. 21 at 11–14.

Multiple defendants may be charged together in the same Information when they are alleged to have participated in the same acts which give rise to a criminal offense. NRS 173.135. However, "if it appears that a defendant . . . is prejudiced by a joinder of defendants," the district court has authority to sever a joint trial. NRS 174.165(1); *Rodriguez v. State*, 32 P.3d 773, 778 (Nev. 2001). "[S]everance should be granted when the defendant 'shows that the core of the co-defendant's theory by the jury precludes acquittal of the defendant.'" *United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999). Inconsistent or antagonistic defenses entitle defendants to a severance if they are antagonistic to the point that they are mutually exclusive. *Rodriguez*, 32 P.3d at 810. "[D]efenses become 'mutually exclusive' when the core of the defendant's defense is so irreconcilable with the core of [the defendant's] own defense that the acceptance of the

---

[5] There was testimony that Murphy picked up Mendoza's wife on the night in question so that Amanda could get their car.

codefendant's theory by the jury precludes acquittal of the defendant. *Rowland v. State*, 118 Nev. 31, 45 (2002), citing *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996).

"Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder...rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his...right to a fair trial." *United States v. Lane*, 474 U.S. 438, 466, n.8 (1986); *Zafiro v. United States*, 506 U.S. 534, 538 (1993) (improper joinder arises when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.")

"It [is] within the sound discretion of the trial judge as to whether the defendants should be tried together or severally" and the courts must review the record to determine whether the trial court abused its discretion when denying a motion to sever. *Opper v. United States*, 348 U.S. 84, 94–95 (1954); *Floyd v. State*, 42 P.3d 249, 255 (Nev. 2002). The defendant must show that actual prejudice resulted from the events as they unfolded during the trial. *Opper*, 348 U.S. at 95. Further, the trial court was required to weigh the prejudice of joinder against "the dominant concern [of] judicial economy." *Tabish v. State*, 72 P.3d 584, 591 (Nev. 2003).

Murphy filed a pre-trial motion to sever. ECF No. 32-19. He argued that his and Mendoza's defenses were mutually exclusive. Murphy intended to present the defense that he didn't drive to either house that day and had nothing to do with the planning or execution of the attempted armed robbery. Murphy said he anticipated that Mendoza would present the defense that Murphy and others threatened him, which reasonably forced him to take part in the robbery. He acknowledged that he was speculating about Mendoza's trial strategy. The state district court denied the motion. *See* ECF No. 21 at 12, ECF No. 73 at 14–15.

At trial, Mendoza testified in detail that Murphy planned and took part in the attempted robbery. The prosecution cross-examined him; counsel for Murphy and Laguna both declined to cross-examine. Murphy then filed a supplemental motion to sever. ECF No. 22-14. The trial judge discussed the motion with the parties. ECF No. 40-2 at 4–21.

The court reasoned:

> [T]he bottom line defaults to what would be different if we . . . severed the trial and had – everybody had their own trial? . . . . And I don't see that there would be any difference, because Mr. Mendoza's testimony would still come in. Figueroa would testify three times. Presumably, you know . . . Summer [Rice] would testify. Mr. Mendoza's testimony could come in. So, even if we had a severed trial, there's not going to be any difference.

*Id*. at 4–5.

The court noted that the jury would be instructed that before they can consider the testimony of any accomplice—Mendoza, Figueroa, or Rice—they have to find that there is sufficient evidence to connect Murphy and Laguna to the crime. The court said both Murphy's and Laguna's defenses were that even if their phones were in the general areas that doesn't prove that they were there or that they were involved. Mendoza admitted to the conspiracy, the attempted home invasion, the attempted burglary, and admitted to shooting the victim. But his defense to the shooting was self-defense. The court concluded that whether the jury accepted or rejected Mendoza's self-defense argument, they could still find that Murphy and Laguna were not involved. Thus the court found that their defenses were not mutually exclusive. The court found no prejudice because Mendoza would testify the same if he was subpoenaed to testify at Murphy's trial. The court stated:

> . . . Mr. Murphy and Mr. Laguna haven't been deprived of any kind of trial right, because their decision to not cross-examine Mendoza given what their defense if, is a strategic decision, and maybe not a bad one, because if the argument is, hey, you know, as [Laguna's counsel] told the jury in opening statement, I'm not going to be doing much here in this trial because there's no real evidence against my client. He – the phone isn't placed in his hand, and we – that's – that's it, you know, I really have little to say. So, if that's the argument for why there's a strategic decision not to cross, then there's no deprivation of trial right.

*Id*. at 7.

The court denied the trial motion to sever. *Id*. at 21. The court instructed the jury before deliberations that it was their duty "to apply the rules of law contained in these instructions to the facts of the case and determine whether or not the defendants are guilty of one or more of the

offenses charged." ECF No. 74-2 at 8. The jury was instructed that they "must give separate consideration to each individual defendant and to each separate charge against him" and that each defendant is "entitled to have his case determined from his own conduct and from the evidence that may be applicable to him." *Id*. at 10. The jury was also instructed that the "conviction shall not be had on the testimony of an accomplice unless he/she is corroborated by other evidence… [that] tends to connect the defendant with the commission of the offense." *Id*. at 52; *see also id*. at 53.

The Nevada Court of Appeals held that Murphy failed to show that joinder deprived him of his constitutional rights:

> Murphy next argues that the district court abused its discretion by denying both his pre-trial and trial motions for severance because his and co-defendant Jorge Mendoza's defenses were antagonistic and mutually exclusive. We review a district court's decision to sever a trial for abuse of discretion. *Chartier v. State*, 124 Nev. 760, 764, 191 P.3d 1182, 1185 (2008). "[I]t is well settled that where persons have been jointly indicted they should be tried jointly, absent compelling reasons to the contrary." *Jones v. State*, 111 Nev. 848, 853, 899 P.2d 544, 547 (1995). "A defendant seeking severance must show that the codefendants have conflicting and irreconcilable defenses and there is danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Marshall v. State*, 118 Nev. 642, 646, 56 P.3d 376, 378 (2002) (internal quotation omitted). However, "mutually antagonistic defenses are not prejudicial per se"; a defendant must also demonstrate that the joint trial "prevented the jury from making a reliable judgment regarding guilt or innocence," or compromised a specific trial right. *Id*. at 646-48, 56 P.3d at 379-80 (internal quotation omitted).
>
> Prior to trial, Murphy did not present to the district court anything beyond speculation that he and Mendoza would present mutually exclusive defenses, and thus, the district court did not abuse its discretion by denying Murphy's pre-trial motion to sever. While Mendoza's testimony during trial implicated Murphy, and was therefore antagonistic to Murphy's defense that he was not involved, it was not so antagonistic to render the defenses mutually exclusive. *See United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991) ("Mutually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other."). Moreover, Mendoza's testimony did not amount to a second prosecution of Murphy, and any prejudice was properly addressed through jury instructions. *See Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) (recognizing the risk of prejudice due to antagonistic defenses can be cured with proper instructions); *cf. Tootick*, 952 F.2d at 1082-85 (holding that counsel's repeated accusations against the other codefendant amounted to a second prosecution, and the lack of curative jury instructions resulted in manifest prejudice and reversible error).

11

Further, Murphy fails on appeal to show that joinder compromised a specific trial right or prevented the jury from reliably determining guilt or innocence. *Cf. Chartier*, 124 Nev. at 766-67, 191 P.3d at 1186-87 (concluding that the cumulative effect of the mutually exclusive defenses and the defendant's inability to fully present his theory of defense warranted severance); *Ducksworth v. State*, 113 Nev. 780, 794, 942 P.2d 157, 166 (1997) (concluding severance was warranted where joinder violated defendant's right to confrontation). In addition, the State presented accomplice testimony and cellular telephone records that were sufficient to support Murphy's conviction absent Mendoza's testimony. *See Marshall*, 118 Nev. at 648, 56 P.3d at 380 (concluding that an antagonistic defense was inadequate to support severance where the State presented overwhelming evidence against both defendants and the State's case was not dependent on either defendant's testimony). Therefore, the district court did not abuse its discretion by denying Murphy's motions to sever the trial.

ECF No. 43-6 at 4–6.

Rice and Figueroa had already testified before Mendoza took the stand. Mendoza's mother-in-law testified that her daughter Amanda was married to Jorge Mendoza. ECF No. 36-5 at 95–141. Murphy had known the Mendoza family since he was very young; he and Amanda referred to each other as cousins, and Murphy and Jorge Mendoza hung out together somewhat regularly. Mendoza and his family lived with Amanda's mother. The night of the incident, Amanda was looking for Jorge because she wanted to make sure the car was back in time to take the kids to school in the morning. Amanda told her mother that Murphy was going to pick her up to get the car.

The jury thus had already heard testimony that Murphy drove Mendoza's wife to find Mendoza's car, which was used in the attempted robberies. ECF No. 36-5 at 97, 100–101, 104–108. They had already heard that Murphy's cell phone signal placed him at the earlier attempted robbery, the later attempted robbery, and talking with and present with the co-conspirators throughout the day. *See* ECF No. 39-1 at 48–49; ECF No. 43-1 at 27.

Mendoza's testimony was damaging to Murphy. But "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. And severance is not necessarily warranted solely because each defendant seeks to

12

blame the other for the crime. *Marshall v. State*, 56 P.3d 376 (Nev. 2002). The jury could have either accepted or rejected Mendoza's self-defense argument and still concluded that Murphy was not involved in the attempted robbery.

Murphy has not shown that the Nevada Court of Appeals' decision on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, the Court denies habeas relief on ground 1.

### B. Ground 2—denial of motion to exclude witness

Murphy contends that the trial court erred when it allowed Rice to testify after the prosecution disclosed her late. ECF No. 21 at 15–17. Rice accepted a guilty plea agreement, and the State filed a supplemental notice of witnesses five days before trial.

The right to present witnesses is subject to the established rules of procedure. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). And because both the prosecution and defense are subject to those rules, even probative evidence may be precluded from trial if either side fails to comply with a valid discovery rule. *Michigan v. Lucas*, 500 U.S. 145, 151 (1991). *See also United States v. Nobles*, 422 U.S. 225, 241 (1975) ("The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system.").

In Nevada, the prosecutor must file and serve upon defense a written notice containing the names and last known addresses of all potential witnesses it intends to call in the prosecution's case in chief no less than five judicial days before trial. NRS 174.234(1)(a)(2). And the prosecutor must "file and serve written notice...as soon as practicable after the party determines that the party intends to call an additional witness..." NRS 174.234(3)(a). "The court shall prohibit an additional witness from testifying if the court determines that the [prosecutor] acted in bad faith by not including the witness on the written notice required pursuant to [NRS. 174.234(1)(a)(2)]. *Id.*

If a party fails to comply with the discovery rule, "[a] trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial." *Taylor v. Illinois*, 484 U.S. 400, 415 (1988). If the party's explanation reveals "that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," the trial court is within their discretion to exclude the witness from testifying. *Id*

While Figueroa took a guilty plea deal early, Rice was going to stand trial with Murphy, Laguna, and Mendoza. The State filed a supplemental notice of witnesses five days before trial that indicated that Rice was pleading guilty and would testify. ECF No. 33-6. The next day, Murphy filed a motion to exclude her testimony. ECF No. 33-7. He argued that the State waited nineteen months until three judicial days before trial to reach a plea agreement with Rice. The court held a hearing and noted that the parties have a continuing duty to file and serve the names of additional witnesses as soon as they become known. The court held that the State was not late in disclosing Rice because notice was given less than 24 hours after the court took Rice's guilty plea. The court concluded that Murphy was not prejudiced because Figueroa's and Ashley Hall's testimony before the grand jury was very clearly that Murphy—aka Duboy—got the information about the drug supplier from Rice and that Hall also learned through Rice that there was a plan to rob Joey Larsen. And Figueroa, Hall, and Larsen had always been listed as trial witnesses.

The Nevada Court of Appeals concluded that the trial court likely abused its discretion by allowing the testimony but that Murphy didn't show bad faith or prejudice:

> Murphy next contends that the State failed to provide timely notice of its intent to present accomplice Summer Larsen as a witness. We review a district court's decision to admit testimony for an abuse of discretion. *See Brant v. State*, 130 Nev. 980, 984, 340 P.3d 576, 579 (2014) (reviewing the admission of expert testimony for abuse of discretion). Upon a finding that the district court abused its discretion, this court conducts harmless-error review. *See* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

14

NRS 174.234(1)(a)(2) requires the State to file and serve written notice of all witnesses it intends to call during its case-in-chief "not less than 5 judicial days before trial." Failure to notice a witness will be error, but will not warrant reversal unless the error prejudiced the defendant or the State acted in bad faith. *See* NRS 174.234(3); *Mitchell v. State*, 124 Nev. 807, 819, 192 P.3d 721, 729 (2008).

The district court likely abused its discretion by allowing Ms. Larsen's testimony when the State gave notice of Ms. Larsen as a witness only three judicial days before trial, but Murphy fails to establish that the State acted in bad faith or the error caused prejudice. We conclude that in light of the record as a whole, any error by allowing the testimony was ultimately harmless. Ms. Larsen did not testify until September 19, 2016, providing Murphy with eleven total days to prepare for her testimony. Moreover, Ms. Larsen's testimony was harmless in light of the overwhelming evidence against Murphy. Accordingly, the district court did not abuse its discretion by denying Murphy's motion to exclude Ms. Larsen's testimony. *See Mitchell*, 124 Nev. at 819, 192 P.3d at 729 (concluding the district court did not abuse of discretion by allowing testimony of an undisclosed witness where record showed no bad faith and the appellant failed to show prejudice).

ECF No. 43-6 at 3-4.

The Nevada Court of Appeals reasonably concluded that any error in allowing Rice to testify was harmless. Substantial evidence supported the verdict against Murphy. He has not demonstrated that the Nevada Court of Appeals' decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, the Court denies habeas relief on ground 2.

**C. Ground 3—waive of cross-examination of co-defendant**

Murphy argues that his trial counsel was ineffective when he waived cross-examination of Mendoza in violation of his Fifth, Sixth, and Fourteenth Amendment rights. ECF No. 21 at 17–18.

### 1. *Procedural default*

Ground 3 was not fairly presented to the state courts and therefore it is technically exhausted but procedurally barred from state court review. *See* ECF No. 63 at 8–9. Federal habeas review of procedurally defaulted claims is barred unless the petitioner can demonstrate cause for the default and actual prejudice or demonstrate that failure to consider the claims will result in a

fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991). In *Martinez v. Ryan*, the Supreme Court held that the absence or inadequate assistance of counsel in an initial-review collateral proceeding may be relied upon to establish cause excusing the procedural default of a claim of ineffective assistance of trial counsel. 566 U.S. 1, 9 (2012). Murphy had no counsel in his state postconviction habeas proceedings, which provides good cause to overcome the state procedural default. *See* ECF Nos. 43-10,43-14. Because the question of prejudice is necessarily intertwined with the merits of this claim, I previously deferred a determination of whether Murphy can overcome the procedural default until the merits review. ECF No. 63. Because good cause has already been established, I now consider (1) whether Murphy's ineffective-assistance-of-trial-counsel claim is substantial; and (2) if so, whether, on the merits, Murphy was denied effective assistance of trial counsel.[6] *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, this court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 2. *Legal standard*

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The burden is on the petitioner to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

---

[6] It has not been disputed (1) that a state post-conviction proceeding in the state district court was an initial-review collateral proceeding for purposes of *Martinez*, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### 3.  *Analysis*

Here, Murphy argues that his counsel should have cross-examined Mendoza in an attempt to challenge his credibility. Murphy alleges that his counsel could have highlighted Mendoza's untruthful statements to police and other inconsistencies, much like counsel did when he cross-examined Rice and Figueroa. Counsel explained to the court his view that it would not be beneficial to Murphy because it would be difficult to cross-examine Mendoza when Mendoza's main aim was to persuade the jury that he shot in self-defense. ECF No. 40-1 at 252. Mendoza didn't deny his involvement in the conspiracy, burglary, home invasion, and attempted robbery with the co-defendants. Counsel also stated that attacking all aspects of Mendoza's account of events would be unfairly prejudicial to Mendoza.

As discussed above, the court stated:

> . . . Mr. Murphy and Mr. Laguna haven't been deprived of any kind of trial right, because their decision to not cross-examine Mendoza given what their defense if, is a strategic decision, and maybe not a bad one, because if the argument is, hey, you know, as [Laguna's counsel] told the jury in opening statement, I'm not going to be doing much here in this trial because there's no real evidence against my client. He – the phone isn't placed in his hand, and we – that's – that's it, you know, I really have little to say. So, if that's the argument for why there's a strategic decision not to cross, then there's no deprivation of trial right.

ECF No. 40-2 at 7.

Figueroa had already testified, and Murphy's counsel had attacked his credibility. Rice testified about earlier conversations with Murphy, though her testimony did not put Murphy at the crime scene. Murphy's defense was that he had no part in any of the events. It was not an unreasonable trial strategy to decline to cross-examine Mendoza.

Murphy had raised a related argument in his state postconviction petition that his counsel should have asked Mendoza if Murphy: (1) drove the vehicle to the victim's house; (2) participated in the planning of the crimes; and (3) participated in the commission of the crimes. *See* ECF No. 43-28 at 2. The Nevada Court of Appeals concluded that there was no reasonable probability of a different outcome at trial had counsel asked Mendoza these questions:

> At trial, Mendoza testified that Murphy participated in discussions where the codefendants planned the crimes, and following the planning discussion, Murphy drove Mendoza and others to the victims' house. Mendoza also testified that Murphy waited in the vehicle while some of the codefendants entered the victims' house in an attempt to take the victims' marijuana, a shootout with the victims ensued, and Mendoza was shot in his leg and he shot toward the victims' house.
>
> Although Murphy's counsel did not question Mendoza, given Mendoza's testimony that Murphy planned and participated in the crimes, Murphy failed to demonstrate his counsel was deficient or a reasonable probability of a different outcome at trial had counsel questioned Mendoza regarding these topics.

ECF No. 43-28 at 3.

Rice and Figueroa testified before Mendoza took the stand. The jury also heard separate testimony that later, on the night of the incident, Murphy drove Mendoza's wife to find Mendoza's car. Testimony had also been presented placing Murphy's cell phone at the earlier attempted robbery and in the vicinity of Larsen's house at the time of that invasion. Testimony had been presented regarding cell phone records that showed Murphy communicated with Figueroa, Laguna, and Mendoza throughout the day. Mendoza testified with specificity about Murphy's involvement. Cross-examination risked highlighting his testimony on direct even more sharply. Murphy has not demonstrated a reasonable probability of a different outcome at trial if his counsel had cross-examined Mendoza. Because Murphy's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate ineffectiveness or prejudice under *Strickland*, Murphy fails to overcome the procedural default of ground 3. Ground 3 is dismissed as procedurally barred from federal review.

## V.       Certificate of Appealability

This is a final order adverse to Murphy. Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). I have sua sponte evaluated the claims within the amended petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying these standards, I find that a certificate of appealability is unwarranted.

## V.       Conclusion

It is therefore ordered that the first-amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 **[ECF No. 21] is denied**.

It is further ordered that a certificate of appealability is denied.

It is further kindly ordered that the Clerk of Court

- Substitute Débora Borgas for respondent Calvin Johnson and
- enter judgment and close this case.

Dated:  March 16, 2026

_____
Cristina D. Silva
United States District Judge

19